# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed: November 14, 2024

\* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| MARY JO DRCAR, | \* |
| | \* |
| Petitioner, | \* |
| v. | \* |
| | \* |
| SECRETARY OF HEALTH | \* |
| AND HUMAN SERVICES, | \* |
| | \* |
| Respondent. | \* |

No. 21-1766V

Special Master Gowen

\* \* \* \* \* \* \* \* \* \* \* \* \*

*Howard Mishkind*, Mishkind Kulwicki Law Co., LPA, Cleveland, OH, for petitioner.
*Jamica Littles*, United States Department of Justice, Washington, DC, for respondent.

## RULING ON DAMAGES[1]

On August 26, 2021, Mary Jo DrCar ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program.[2] Petition (ECF No. 1). Petitioner alleged that as a result of receiving the influenza ("flu") vaccine on October 14, 2019, she developed Guillain-Barré syndrome ("GBS"). *Id.* Respondent filed an Amended Rule 4(c) report stating that petitioner satisfied the criteria set forth in the Vaccine Injury Table and the Qualifications and Aids to Interpretation and requested that the Court issue a decision on entitlement. Amended Rule 4(c) Report ("Rept.") at 14 (ECF No. 42). On December 11, 2023, I issued a Ruling on Entitlement, finding that petitioner has satisfied the criteria of the Vaccine Injury Table for GBS based on a review of the record and respondent's recommendation. Ruling on Entitlement (ECF No. 43).

On February 21, 2024, petitioner filed a Motion for a Ruling on Damages and Damages

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), **because this unpublished opinion contains a reasoned explanation for the action in this case, I intend to post it on the website of the United States Court of Federal Claims.** The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7. Before the opinion is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). "An objecting party must provide the court with a proposed redacted version" of the opinion. *Id.* **If neither party files a motion for redaction within 14 days, the opinion will be posted on the court's website without any changes.** *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to 34 (2012) (hereinafter "Vaccine Act" or "the Act"). Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

Brief.  Petitioner ("Pet'r") Brief ("Br.") (ECF No. 51).  Respondent filed a response on March 21, 2024.  Resp't Brief (ECF No. 52).  Petitioner filed a reply brief on March 28, 2024.  Pet'r Reply Brief (ECF No. 53).

For the reasons set forth below, I find that petitioner is entitled to $200,000.00 in pain and suffering, $1,000.00 for future pain and suffering reduced to net present value per year for petitioner's life expectancy; $92,294.21 for lost wages; $3,468.00 for past unreimbursed expenses; and $1,074.64 for future medical expenses.

## I.    Summary of the Record

### a.  Petitioner's medical records

Petitioner was sixty-four years old when she received the flu vaccination on  October 14, 2019.  Prior to receiving this vaccine, she was being treated for back pain and bilateral hip pain by Dr. Salim Hayek.  Pet'r Exhibit ("Ex.") 8 at 24-42.  While she endorsed low back pain that radiated to her legs, she denied numbness or tingling in her right leg, but experienced some weakness.  *Id.* at 36.  Petitioner was taking Gabapentin twice a day and Tylenol every eight hours for pain.  *Id.* Petitioner had a caudal epidural steroid injection which provided pain relief for two months on August 8, 2018.  Petitioner received another steroid injection in December 2018 as well.  *Id.* at 29.  At the appointment on December 12, 2018, she denied any numbness or tingling in her legs.  *Id.*

On October 16, 2019, petitioner had an appointment with Dr. Hayek for lower-back pain, lateral hip pain, and bilateral upper gluteal pain.  Pet'r Ex. 8 at 28.  Her motor strength and reflexes were recorded as "normal."  *Id.* at 27.  Petitioner also complained of increased dysesthesias with pin prick in her lower extremities and the note was, "examination of sensation is abnormal."  *Id.*  An MRI of petitioner's thoracic spine was ordered, and he prescribed Gralise[3] to replace petitioner's Gabapentin and Topamax.  *Id.*

On November 21, 2019, petitioner went to the emergency department of Ahuja University Hospital complaining of decreased sensation to lower extremities.  Pet'r Ex. 4 at 59.  Petitioner was "positive" for "pain, tingling, and weakness."  *Id.*  She reported that "about a month ago," she had a tingling and cold sensation in her feet which became worse and eventually became painful.  *Id.* She's had difficulty walking for the past month and could not walk without assistance at that time.  *Id.*  Petitioner's husband stated that petitioner was unable to walk or sleep in the past 24 hours and her pain was a 7 out of 10.  Petitioner also reported her extremities feeling numb, weak, cold and painful.  *Id.*  The ED note also stated, "Unremarkable lumbar spine MRI 2 months ago in the setting of these symptoms."  *Id.*  Dr. Aryeh Shapiro performed a neurologic exam and recorded that petitioner's strength was 5/5 but petitioner was unable to ambulate.  *Id.* at 63.  Dr. Shapiro also wrote that petitioner's "exam reveals no gross neuro abnormalities.  Based on her exam at this time, I do not believe that she requires emergent imaging as my suspicion for spinal etiology of her symptoms is very low.  This [does] not clearly follow a radicular pattern.  *Id.* at 64. Petitioner was treated with Tramadol, Zofran, and given a Magnesium sulfate IV.  *Id.*

---
[3] Gralise is a time released form of gabapentin.

A neurological exam performed on November 22, 2019, showed that petitioner had "reduced pin sensation in a stocking-glove distribution from the feet to the knees and from the fingers to the MCP joints," and these symptoms were symmetric. *Id.* at 109. The assessment was, "progressive sensory change with exam findings suggestive of early cervical myelopathy or peripheral neuropathy." *Id.* at 113. An MRI was ordered of petitioner's cervical spine. *Id.* The MRI showed that petitioner had "multilevel degenerative changes of the cervical spine, including moderate spinal canal stenosis at C4-C5 and C5-C6 and mild spinal canal stenosis at C3-C4. There is neural foraminal narrowing at a few levels." *Id.* at 34. Petitioner was given sodium and magnesium to address an electrolyte imbalance. *Id.* at 146.

Petitioner was discharged on November 24, 2019 when her weakness had improved. *Id.* at 145. In the discharge summary, petitioner was still endorsing numbness in her hands and feet, but weakness had improved. *Id.* The "Hospital Course" section of her record states, "She was given electrolyte repletion. MRI spine shows moderate cervical stenosis and epidural lipomatosis. Neuro consulted, recommended outpatient EMG. Her weakness improved with electrolyte repletion, but paresthesias did not." *Id.*

On December 3, 2019, petitioner had a follow-up appointment with her primary care physician. Pet'r Ex. 11 at 5. Petitioner was diagnosed with a "balance disorder" and her physician recommended that she continue Gabapentin and follow-up with a neurologist. *Id.* at 6. Petitioner had an EMG/NCS on December 6, 2019, which found that petitioner had "active denervation" of the "pronator teres, medial gastrocnemius, and extensor hallucis longus. Motor unit morphology showed normal duration with variable polyphasia with reduced recruitment in the left first dorsal interossesous, abductor pollicis brevis, pronator teres, triceps, deltoid, extensor hallucis longus, tibialis anterior, and iliacus muscles." *Id.* The impression was, "a markedly abnormal study," and "there is electrophysiologic evidence consistent with a subacute motor and sensory demyelinating polyneuropathy with secondary axonal features." *Id.* at 4. Neurologist, Dr. Jenice Robinson reviewed petitioner's EMG/NCS and wrote, "[patient's] study was consistent with an acquired demyelinating neuropathy. Given her symptom onset is most suspicious for a form of Guillain-Barre syndrome, but it cannot be excluded that she is actually presenting acutely with CIDP." *Id.* at 6. Dr. Robinson discussed the option of petitioner receiving IVIG but was waiting for the results of her blood tests. *Id.*

Petitioner went to Dr. Crystal Lantz-DeGeorge, on December 17, 2019, to establish care and for "generalized weakness-referred by pain to markedly abnormal neuromuscular EMG [consistent with] GBS vs. CIDP." Pet'r Ex. 12 at 31. In the "History of Present Illness" it states that petitioner "started noting numbness in feet and impaired balance 11/2019" and that she is taking gabapentin 300 mg and she had to stop working. *Id.* Dr. DeGeorge indicated that petitioner reports "bilateral hand hyperesthesias and paresthesias" and that her "legs are weak, feet are weak." *Id.* She was "wall walking" and stopped driving. *Id.*

On January 3, 2020, petitioner presented for an ultrasound of her forearms. Pet'r Ex. 8 at 23. The purpose was to "assess for nerve hypertrophy and possibly inflammatory neuropathy in this patient with a progressive predominantly lower motor neuron syndrome," and "to evaluate the echotexture and size of the right and left median nerves at mid-forearm and mid-arm and

lower trunks of the brachial plexus." *Id.* The results were "an abnormal neuromuscular ultrasound examination of the upper extremities and brachial plexus," and that "there was evidence of moderate nerve enlargement at non-entrapment sites." *Id.* at 24. The impression was, "In absence of clinical features that suggest a hereditary demyelinating neuropathy, sonographic enlargement of median nerve segments and the brachial plexus accurately identifies patients with chronic inflammatory neuropathies." *Id.*

From January 7-10, 2020, petitioner completed three sessions of IVIG. *See* Pet'r Ex. 7. Because her anemia continued, on January 24, 2020, petitioner had an appointment with oncology/hematology, for macrocytic anemia. Pet'r Ex. 12 at 59. At this appointment, petitioner was still experiencing coldness and numbness of her upper and lower extremities and using support to walk at home. *Id.* Petitioner's bilateral lower extremity strength was recorded at 3 of 5. *Id.* Dr. Huang diagnosed petitioner with "macrocytic anemia in the setting of GBS," and that her "anemia [is] likely secondary to anemia of chronic disease." *Id.* at 67. Petitioner had a follow-up with her primary care physician on February 4, 2020. *Id.* at 26. Petitioner had "new onset [of] low back pain" and had a referral for aquatic therapy. *Id.* Petitioner was "happy with progress for presumed GBS/CIDP after IVIG." *Id.*

Petitioner went to Dr. Salim Hayek on February 7, 2020 for low back pain and bilateral hip pain. Pet'r Ex. 8 at 20. Petitioner reported that one-week post-IVIG treatment, she had felt improvement and the feeling in her extremities improved, along with regaining some strength. *Id.* However, she was still unsteady when walking, which resulted in a fall. *Id.* Petitioner stated that since she fell, she was having bilateral low back pain. *Id.* Petitioner was tender over the sacral areas of her lumbar spine. *Id.* at 22. Further, she had "unsteady walking with decreased sensation in a stocking glove distribution bilaterally over the upper and lower extremities." *Id.* Dr. Hayek diagnosed petitioner with lumbar radiculopathy and lumbar spinal stenosis. Pet'r Ex. 8 at 25. Dr. Hayek also ordered a CT scan of her pelvis. *Id.*

At a follow-up with Dr. Lantz-DeGeorge, on February 24, 2020, for changes with her blood pressure medication, petitioner reported "some improvement" after the IVIG, but still felt significant numbness and "coldness" in her hands and feet, which was "interfering with day-to-day life." *Id.* at 24. Petitioner required "a lot of assistance with walking," and had a significant fear of falling. *Id.* Her symptoms were not worsening, and she did not endorse weakness. *Id.* Petitioner was diagnosed with GBS vs. CIDP and recommended to continue gabapentin. *Id.* at 23.

The next appointment petitioner had with Dr. Hayek was April 17, 2020 via videoconference. Pet'r Ex. 8 at 16. Petitioner's low back pain was a 3 out of 10. *Id.* She was still experiencing a cold sensation in her hands and feet that was "very bothersome." *Id.* Petitioner took a Tramadol, which helped resolve some of her symptoms. *Id.* Dr. Hayek gave petitioner a prescription for Tramadol, an opioid, and referred her to physical therapy. *Id.* at 18.

Petitioner saw Dr. Huang for her anemia on May 11, 2020. Pet'r Ex. 12 at 69. Petitioner reported that she was still having coldness and numbness in her upper and lower extremities bilaterally and she was using support at home to walk, but that her GBS was "stable." *Id.* After a review of petitioner's labs and a physical exam, Dr. Huang wrote that "no intervention is

needed at this time," for her macrocytic anemia." *Id.* at 71.

At a preventive health examination on May 29, 2020 with Dr. Lantz-DeGeorge, "CIDP" was listed under petitioner's "History of Present Illness," and it noted, "doing better but still significant symptoms." Pet'r Ex. 12 at 20.

On June 8, 2020, petitioner had another appointment with Dr. Hayek for low back pain. Pet'r Ex. 8 at 11. Petitioner's low back pain was a 4-5 out of 10 and it occasionally radiates into her bilateral hips. *Id.* Petitioner was unstable when walking, although she attributed this to the GBS. *Id.* Additionally, her lower back pain was "worse with initiation of movement such as when sitting down or getting out of bed, standing up." *Id.* Petitioner still endorsed numbness and cold sensation in her bilateral upper and lower extremities. *Id.* It was noted that petitioner had an updated EMG. Petitioner's symptoms responded well to Tramadol. *Id.* Her gait was "shuffling." She also had decreased sensation to light touch in both hands and legs. *Id.* at 13. Petitioner also had weakness in her back on rotation, flexion, and extension. *Id.* at 14. She was given a refill of Tramadol and recommended that she increase her gabapentin to 600 mg. *Id.*

Petitioner had a telephone appointment with Dr. Hayek on September 2, 2020. Pet'r Ex. 8 at 7. Petitioner reported that she was recently diagnosed with stage 1 breast cancer. *Id.* Dr. Hayek diagnosed petitioner with advanced "right hip osteoarthritis" and "SI joint pain." *Id.* In the "Review of Systems" portion of the record, petitioner's "musculoskeletal" was positive for back pain and "neurological," was positive for convulsions and GBS. *Id.* Dr. Hayek gave petitioner a refill of Tramadol.

On November 12, 2020, Dr. Hayek wrote a letter explaining that petitioner's GBS began after the flu shot on October 14, 2019. Pet'r Ex. 9 at 1. Dr. Hayek wrote that petitioner developed "symptoms suggestive of neuropathy in both lower extremities," and that these complaints were "wholly unrelated to her previous complaints of back pain with radicular symptoms to the lower extremities secondary to epidural lipomatosis causing spinal stenosis." *Id.* at 1. Dr. Hayek also wrote, "The medical reason [petitioner] was originally being treated is not related to her inability to work. The Guillain-Barré Syndrome symptoms are a separate medical issue that began in November 2019, and has resulted in her disability." *Id.*

Petitioner was evaluated by Dr. Steven Fitzgerald, an orthopedist, on April 15, 2021. Pet'r Ex. 10 at 5. Petitioner was complaining of right hip pain and "has known advanced underlying osteoarthritis." *Id.* Petitioner stated that "walking any sort of distance is difficult for her and that she had difficulty putting on her shoes and socks or getting up from a seated position." *Id.* Petitioner was unable to participate in physical therapy or home exercises due to pain and disability. *Id.* She was there to specifically discuss a total right hip arthroplasty. Petitioner had significant pain in all directions with massive movement. *Id.* Dr. Fitzgerald diagnosed petitioner with "severe degenerative changes of the right hip with complete loss of joint space" and discussed the option of total hip arthroplasty. *Id.* at 6. Petitioner wanted to move forward with the operation. On May 3, 2021, petitioner had a "right total hip arthroplasty," performed by Dr. Fitzgerald. *Id.* at 9. Petitioner had a follow-up appointment on June 17, 2021 with Dr. Fitzgerald. Pet'r Ex. 10 at 12. Petitioner had "free range of motion of right hip with no pain radiating to the groin whatsoever." *Id.*

Petitioner had an appointment with Dr. Christopher Geiger on December 20, 2021.  Pet'r Ex. 13 at 1.  Petitioner was "still symptomatic" with "distal sensory loss, neuropathic pain, and chronic fatigue."  *Id.*  Dr. Geiger wrote that he would expect "any further healing to occur in the next six months," and then after that timeframe, "I would expect them to be permanent in nature."  *Id.*  Petitioner reported that she had more sensation in her heels since her last appointment, but her hands and feet continued to be painful and cold.  *Id.*  Petitioner's gabapentin was controlling her symptoms.  *Id.*  Dr. Geiger also informed her that receiving the flu shot was low risk but that it would be a personal decision.  *Id.*

On June 20, 2022, petitioner had an appointment with Dr. Geiger.  Pet'r Ex. 14 at 6.  He wrote, "Since the time of her last appointment, her neurological symptoms are largely unchanged," and that she continued to have "neuropathic pain, fatigue, gait instability, numbness, and muscle weakness."  *Id.* at 7.  "Her pain is always present, but fairly well controlled on her current regime of gabapentin 300 mg three times a day….Occasionally, she will supplement with Tylenol if she is having a bad day."  *Id.*  With her hands being numb, she had burned her hand on a curling iron, as she was unaware that she was holding the heating element.  Petitioner also reported that it becomes progressively more difficult to walk throughout the day and her legs feel heavier.  *Id.*  Petitioner also reported that her hands were starting to twitch, which became frustrating when doing fine motor tasks, such as using her cell phone.  *Id.*  Dr. Geiger wrote, "She continues to have multiple symptoms (pain, numbness, weakness, gait instability), which are long-term sequela of the aforementioned event. Given that we are now over 2 years removed from her initial injury, I do not believe there will be any further neurological recovery."  *Id.* at 6.  Dr. Geiger stated that, "Treatment at this point will focus on symptom control and fall mitigation," and recommended that she continue her gabapentin as currently prescribed.  *Id.*

Petitioner returned to Dr. Geiger on June 26, 2023.  Pet'r Ex. 28 at 1.  Petitioner had "minor improvements in her finger numbness" and no new or worsening symptoms.  *Id.*  Petitioner reported that the numbness in her fingers had improved, which allowed her to use her hands better.  She was still getting shooting pain in her lower extremities and still had poor balance.  *Id.*  Petitioner stated that she could walk unassisted but at times used her husband for balance.  *Id.*  She had trace reflexes in her biceps and triceps bilaterally, and absent ankle and knee reflexes.  *Id.* at 2.  Her sensation was diminished to pinprick below her elbows bilaterally and below her knees bilaterally.  *Id.*  Dr. Fagan, a neuromuscular fellow, wrote that petitioner's "numbness, neuropathic pain, weakness and gait instability," are long term sequalae of the AIDP.  *Id.* at 1.  Additionally, Dr. Fagan wrote, "As the initial injury was over three years ago, any further significant neurological recovery is unlikely."  *Id.*  No additional medical records have been filed.

### b.  Additional Evidence

In addition to the above discussed medical records, petitioner, her family members and co-workers  provided sworn statements.  Pet'r Exs. 29-37.

### 1.  Petitioner's Statement

In her affidavit, petitioner stated that her neurological injuries are separate from her pre-existing medical conditions, and that her pre-existing medical conditions, "do not in any way cause or contribute to my current neurological injuries and disability secondary to my flu vaccine and diagnosis of AIDP." Pet'r Ex. 37 at ¶ 4. Petitioner stated that she had right hip replacement surgery on May 3, 2021, which relieved her lower back pain and she no longer had to see Dr. Hayek for back pain management. *Id.* at ¶ 7. Further, she is no longer under the care of Dr. Stephen Fitzgerald. *Id.*

With respect to her GBS symptoms, petitioner stated that she continues to have on going paresthesia, pain, and muscle tightness in her hands, lower legs, and feet. *Id.* at ¶ 8. Further, she suffers from fatigue and difficulty sleeping due to these symptoms. *Id.* Petitioner stated that she, has "a loss of sensitivity in my hands and feet, preventing me from performing a multitude of day-to-day tasks." *Id.* at ¶ 9. Petitioner requires a handrail to go up and down stairs; she is unable to sit or stand for extended periods of time; and is unable to cook "effectively" since she cannot feel her fingers. *Id.* Petitioner needs to shower sitting down due to instability standing, and she is unable to walk distances without using assistance. *Id.* She stated that being unable to drive is "most devastating." *Id.*

Petitioner went on disability on December 18, 2019, and while her employer kept her job open for two years, she was discharged due to her GBS. *Id.* at ¶ 10. Her job, as an industrial safety specialist, required extensive walking, stair climbing, sitting, driving, and computer work, all which she is unable to do effectively. *Id.* She stated that she was "planning on working well into my seventies since I loved what I did and had no physical reasons to quit." *Id.*

Petitioner stated that she has "difficulty performing tasks as simple as squeezing a toothpaste tube," and putting-in and removing her contacts is now a "challenge" since she is unable to feel the lenses on her fingertips. *Id.* at ¶ 11. She stated that "it is difficult to hold a phone because my hand becomes colder and more painful in a few minutes." *Id.* at ¶ 14. Petitioner has hired someone to do housecleaning. *Id.* Further, she has difficulty in performing daily tasks such as styling her hair and make-up, or making a meal, due to fatigue. *Id.* Additionally, her endurance "has completely diminished" and she is unable to participate in social events due to her fatigue. *Id.* at ¶ 19.

She has also lost the ability to participate in leisure activities she previously enjoyed, which included walking for exercise, bike riding, or physically active games with her grandchildren, such as bowling or golf. *Id.* at ¶ 12. Additionally, petitioner stated that she cannot babysit her grandchildren, because she "cannot be counted on in a medical, physical, or fire emergency since she cannot move quickly." *Id.*

Prior to her injury, petitioner's hobbies included cooking and needlework, but now she is unable to do needlework due to loss of sensitivity in her fingers. *Id.* at ¶ 13. Further, when she went to social functions prior to injury, she would dance, but since her GBS, she cannot dance. *Id.* at ¶ 16. Attending sporting events is difficult, as she cannot sit in the bleacher seats or walk up and down stairs. *Id.* at ¶ 14.

Petitioner stated that her "illness and disability have caused great mental anguish for both me and my family, and the life we knew will never be the same as it was, or as we had planned in the future." *Id.* at ¶ 18. Additionally, she stated that she was "not prepared to be old and disabled and my inability to function how I was before my flu vaccination has caused me tremendous emotional distress and an overwhelming loss of enjoyment of life." *Id.* at ¶ 17. Her neurologist explained to her she will not have any further significant improvements in the future and that she "will have to live the rest of [her] life in an altered state from what [she] expected and can no longer live a normal life." *Id.* at ¶ 20.

### 2.  Statements from Family Members

Petitioner's husband, Mr. John W. Drcar, her daughter, Ms. Brooke Slater, son John Drcar Jr. and daughter-in-law Ms. Stephanie Drcar, son-in-law, Mr. Hugh Slater, and brother, Mr. Art Hollis discussed petitioner's love of cooking and living an active life prior to her vaccine injury. *See* Pet'r Ex. 33; Pet'r Ex. 34; Pet'r Ex. 36. Petitioner's husband characterized petitioner as "a vibrant 64-year-old woman. She was active around the house, with our grandchildren and had just started a new job." Pet'r Ex. 34. Ms. Stephanie and Mr. John Drcar's joint letter stated, "Prior to November 2019, [petitioner] was a fully independent and active individual. [Petitioner] regularly watched her grandchildren, hosted dinner and parties, cooked, drove, managed her home, and engaged in all activities of daily living of a healthy adult. [Petitioner] voiced no interest in retirement and was looking forward to her new position at Swagelok." Pet'r Ex. 36. Petitioner's brother wrote that petitioner was, "active in the lives of her grandchildren by providing childcare, traveling to all their school activities, and the multiple sports they participated in," prior to her GBS diagnosis. Pet'r Ex. 29 at 1.

All of petitioner's immediate family explained that in November 2019, petitioner's mobility and quality of life rapidly deteriorated. Pet'r Ex. 33. Ms. Brooke Slater explained that in late October and early November 2019, petitioner's mobility quickly declined, and she watched her mother "transform rapidly from a capable adult, able to walk on her own, hold a spoon, brush her hair, to a person that was now frustrated at the lack of ability to do basic tasks on her own." Pet'r Ex. 36 at 1. Ms. Stephanie Drcar recalled that in the beginning of November 2019, petitioner told a story about needing to take a break walking up a single flight of stairs and how this was unusual, given that she had never struggled with this type of physical exertion before. *Id.* Stephanie and John Drcar stated, "A salient memory from this time was that this was the first Thanksgiving dinner, which petitioner and her husband host every year, that petitioner was unable to assist in the preparation of the dinner because of the profound weakness, pain, and fatigue she was experiencing." Pet'r Ex. 36. Petitioner's husband also wrote, "Thanksgiving was normally my favorite holiday, and [petitioner] always had a great dinner for the family. That year our children stepped up and organized making the dinner. [Petitioner] was able to stand for a couple of minutes to help guide the preparation. She sat occasionally and slept in a chair since the pain, weakness, and numbness overtook her ability to participate in the festivities." Pet'r Ex. 34 at 1. During the acute phase of petitioner's illness, Mr. John Drcar explained that petitioner had difficulty getting to the bedroom unassisted and that petitioner was unable to cut her own food. Pet'r Ex. 34 at 1. Mr. Hollis, petitioner's brother, stated that petitioner's symptoms came on "so quickly that it was extremely heartbreaking to witness her rapid decline." Pet'r Ex. 29. Her GBS has affected her ability to entertain and cook her favorite

recipes for friends and family.  Pet'r Ex. 29.  Mr. Hugh Slater, petitioner's son-in-law wrote, "Not only is [GBS] and the related symptoms painful and severely debilitating, but the deterioration of her quality of life is extremely frustrating….[Petitioner] deals with severe loss of feeling in her extremities, overall weakness and fatigue everyday."  Pet'r Ex. 32.

Petitioner's family members also described how petitioner very much enjoyed working. Her brother, Mr. Hollis stated, "She loved her work knowing she was helping people stay safe in their daily lives at work and at home."  Pet'r Ex. 29.  Ms. Brooke Slater wrote that petitioner "was a role model to [me] for her dedication to her job," and that petitioner, "was quite successful and loved going to work, interacting with employees and teaching them health and safety in the workplace."  Pet'r Ex. 33 at 1-2.  Mr. Hugh Slater, petitioner's son-in-law, stated that petitioner was a "highly functioning executive" but has "become completely unable to perform the functions necessary to excel as a leading Health and Safety expert at a publicly traded medical products company."  Pet'r Ex. 32.  Petitioner had just started a new position in the fall of 2019, prior to her flu shot, and due to the GBS diagnosis and the symptoms had to leave the workforce.  Pet'r Ex. 36; Pet'r Ex. 33 at 2.  Her husband wrote that petitioner was "excited about her new job and it was the best place she had ever work."  Pet'r Ex. 34 at 1. Petitioner's frustration with her GBS symptoms was apparent to her son and daughter-in-law, and they stated, "It was apparent that this was highly distressing to [petitioner], particularly because it impaired her ability to work, even in a remote/virtual capacity."  Pet'r Ex. 36; Pet'r Ex. 34 at 1 ("She was only able to work there for a short time and was forced to retire due to the symptoms she was experiencing.").

Family members also describe that petitioner's ongoing symptoms of numbness and tingling in her extremities and fatigue has affected her activities of daily living.  *See e.g.* Pet'r Ex. 32 ("Not only is the disease and the related symptoms painful and severely debilitating but the deterioration of her quality of life is extremely frustrating.").  Stephanie and John Drcar stated that petitioner "is no longer able to drive, prepare meals, work, and complete other activities of daily living without assistance."  Pet'r Ex. 36 at 1.  Petitioner is no longer able to care for her grandchildren or participate as she had previously done her life.  Her husband wrote, "Having the grandchildren stay overnight was a time she would excitedly plan.  She would plan special activities, meals and treats that they would enjoy," but after her GBS diagnosis and due to her ongoing symptom, she is unable to spend the amount of quality time she previously had with her grandchildren.  Pet'r Ex. 32.

The statement from Stephanie and John Drcar acknowledged that petitioner had regained some function over the past four years, the ease at which petitioner performed basic living tasks is gone and that it takes petitioner significantly longer to complete basic tasks.  Pet'r Ex. 36 at 2. Petitioner's husband explained that petitioner uses a cane "occasionally" for extra support or uses the walls, furniture, or others for support when walking around the house.  Pet'r Ex. 34 at 2. Petitioner has a difficult time navigating stairs on her own and relies on her husband to assist her. *Id.*  Despite making some improvements, petitioner still experiences numbness and tingling in her feet and extreme fatigue.  *Id.*  Petitioner spends most of her time at home now, due to her inability to drive and being unable to participate in activities that she previously enjoyed, due to her fatigue and ongoing symptoms.  Pet'r Ex. 33 at 1.

### 3. Statement of Petitioner's Friends and Co-Workers

Three of petitioner's friends and/or colleagues also submitted statements about how petitioner's GBS has affected her life from their perspective. Petitioner's neighbor of 32 years, Ms. Kathleen Parker, RN, submitted a statement; Ms. Barb Gerard, petitioner's friend since 1999 submitted an impact statement; and petitioner's former colleague of 10 years, Ms. LuAnn Dzura wrote a letter describing the impact GBS has had on the petitioner. *See* Pet'r Exs. 30, 31, and 35.

Consistent with her family's characterization, petitioner was very active in her community and engaging with her friends. Ms. Parker wrote that petitioner organized block parties for the neighborhood and had large holiday gatherings prior to her GBS diagnosis. Pet'r Ex. 31. Ms. Gerard stated that petitioner would organize a large Fourth of July party prior to her GBS diagnosis in 2019, but since then, the party is a "small even with only immediate family invited." Pet'r Ex. 30 at 1. Additionally, petitioner would spend a lot of time outdoors and attending many of her grandchildren's sporting events. Ms. Parker stated that "it was common to see [petitioner] outside playing with her grandchildren." Pet'r Ex. 31. Ms. Dzura wrote that petitioner was "always very happy and full of energy," and that petitioner brought that type of energy to both her job and to personal life. Pet'r Ex. 35. Petitioner would attend many of her grandchildren's school events and host them overnight. *Id.*

Ms. Gerard recounted a time in November 2019 when petitioner and her husband came to her house for dinner and stated that petitioner "stumbled through our front door and needed support to walk." Pet'r Ex. 30 at 1. At the time of the dinner, petitioner had not been diagnosed with GBS, but it was already affecting her. *Id.* After petitioner's GBS diagnosis, petitioner's forced retirement was "heartbreaking" because petitioner loved her job and planned to continue working. *Id.* at 1; *see also* Pet'r Ex. 35 at 1. Petitioner is unable to participate in the activities she had previously enjoyed, including hosting her grandchildren or attending their sporting events due to the inability to drive herself and walk longer distances. Pet'r Ex. 30. Additionally, petitioner's inability to cook or perform little chores around the house made petitioner extremely frustrated. Pet'r Ex. 35. Ms. Dzura described a time in 2022 when she had taken petitioner to a play and petitioner had to use a cane to get to and from the car, walk extremely slowly to the venue, and sit by herself in the handicap seating. Pet'r Ex. 35. Ms. Dzura stated that petitioner had been reluctant to go because she did not want to be a burden on the group and then afterwards, was completely worn out by the experience. *Id.* Ms. Parker stated that petitioner had been nearly completely housebound through COVID and due to her breast cancer treatment and hip replacement. Pet'r Ex. 31. In the fall of 2022, Ms. Parker and petitioner began to walk outside, but very short distances and the petitioner needed significant support. *Id.*

Petitioner told her friends that her neurologist explained that her recovery had plateaued and that she would have to live with her ongoing symptoms of numbness and tingling in her hands and feet, along with fatigue. Pet'r Ex. 30 at 2; Pet'r Ex. 31. Petitioner's friends acknowledged that petitioner has regained some of her mobility over the past four years, but that petitioner's energy levels and ability to engage in the activities in which she had previously engaged and enjoyed are significantly curtailed by her GBS symptoms. Pet'r Ex. 35 at 2; Pet'r Ex. 31.

## II.    Legal Standard

The Vaccine Act provides that "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury," a petitioner may recover "an award not to exceed $250,000." 42 U.S.C. § 300aa-15(a)(4). With regard to pain and suffering and all other elements of damages, the petitioner bears the burden of proof and the medical records are the most reliable evidence of petitioner's condition. *See, e.g.*, *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at \*22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); *Shapiro v. Sec'y of Health & Hum. Servs.,* 101 Fed. Cl. 532, 537-38 (2011).

Prior to my appointment as a special master, former Chief Special Master Golkiewicz and others developed an approach with the goal "to fairly treat all petitioners" by "creat[ing] a continuum of injury", in which the statutory cap was reserved for the most severe injuries and lower awards were made for less severe injuries. *Hocraffer v. Sec'y of Health & Human Servs.*, No. 99-533V, 2007 WL \*914914, at \*5 (Fed. Cl. Spec. Mstr. Feb. 28, 2007). In *Graves¸* Judge Merow granted review of a special master's pain and suffering award, holding that the "continuum" approach was not "rooted in the statute or precedent". *Graves v. Sec'y of Health and Human Servs.,* 109 Fed. Cl. 579, 590 (2013). Judge Merow set forth a different approach in which the first step is to assess an individual petitioner's pain and suffering by looking to the record evidence, without regard to the $250,000 cap. Only then as a second step, if the award would exceed $250,000, it must be reduced to that maximum. *See id.* at 589-90.

In the Vaccine Program's subsequent history, special masters have of course not been bound by *Graves*.[4] However, they have found it to be persuasive. *See, e.g.*, *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at \*10 (Fed. Cl. Spec. Mstr. Moran April 19, 2013) ("Under the interpretation of the statute offered in *Graves*, cases that used the spectrum approach, such as *Hocraffer* and *Long*, are no longer useful measuring points"); *Reed v. Sec'y of Health & Human Servs.*, No. 16.1670V, 2019 WL 1222925, at \*12 (Fed. Cl. Chief Spec. Mstr. Dorsey Feb. 1, 2019) ("it must be stressed that pain and suffering is not based on a continuum"); *Selling v. Sec'y of Health & Human Servs.*, No. 16-588V, 2019 WL 3425224, at \*5 (Fed. Cl. Spec. Mstr. Oler May 2, 2019) ("Pain and suffering is not, however, determined based on a continuum"); *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069, at \*13 (Fed. Cl. Spec. Mstr. Corcoran July 29, 2019) ("… special masters appear to have accepted *Graves*'s methodology since issuance of that decision… I will apply it herein as well, although I do so mindful of the need to consider the overall strength of petitioner's showing herein"), *motion for review granted and remanded on other grounds,* 147 Fed. Cl. 131 (2020); *W.B. v. Sec'y of Health & Human Servs.*, No. 18-1364V, 2020 WL 5509686, at \*3 (Fed. Cl. Chief Spec. Mstr. Corcoran Aug. 7, 2020) ("it must be stressed that pain and suffering is not based on a continuum"). I agree with this prevailing approach. I assess the full value of the damages in a particular case before me, then apply the statutory cap if that becomes necessary.

---

[4] Decisions of special masters and the U.S. Court of Federal Claims constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998). In contrast, the Federal Circuit's holdings on legal issues are binding on special masters. *Guillory v. Sec'y of Health & Human Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd*, 104 F. App'x 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Human Servs.*, No. 13-159V, 2014 WL 504728, at n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

There is no mathematical formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D.*, 2013 WL 2448125, at *9 ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *Id.* at *9 (internal citations omitted). I find it appropriate to also consider any impairments in function and/or lost ability to participate in activities which the petitioner previously enjoyed, as a result of the injury.

A special master may also consider prior pain and suffering awards, especially for similar injuries, from both inside and outside of the Vaccine Program to aid the resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). A special master may also rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

### III.    Party's Contentions

Petitioner requests an award of $200,000.00 for past pain and suffering and an award of $2,000.00 per year for future pain and suffering for her life expectancy. Pet'r Br. at 10. Respondent contends that a more appropriate award of $90,000.00 for petitioner's past pain and suffering and no award of future pain and suffering is appropriate. Resp't Br. at 1. The parties have agreed upon award amounts for lost-wages, past medical expenses, and future medical expenses. Pet'r Br. at 10; Resp't Br. at 1.

In her brief, petitioner argues that the affidavits and petitioner's medical records show that despite having pre-existing health conditions, including back and hip issues, none of these had impacted her quality of life the way her vaccine-related GBS did. Pet'r Br. at 7. Petitioner referenced her brother's affidavit, noting despite petitioner's back and hip issues, she would still climb ladders or walk on a roof for safety inspections. *Id.*; *see also* Pet'r Ex. 29. Petitioner had been fully active in her grandchildren's lives and was committed to her job. Pet'r Br. at 7. Petitioner had been a highly functional, energetic adult, but now she is unable to drive, work, or participate in the "most basic activities of daily living," due to her ongoing disability from her GBS. *Id.* at 7-8.

Petitioner argued that her symptoms from the vaccine related GBS were permanent, as explained by her neurologist. Pet'r Br. at 6. Petitioner wrote that Dr. Geiger's most recent progress note from June 20, 2022, indicated that it was unlikely that petitioner would have any additional neurological recovery and that her symptoms of numbness, tingling, weakness, and gait instability were likely permanent. *Id.*; Pet'r Ex. 14 at 6; Pet'r Ex. 28 at 1. Additionally, Dr. Geiger's letter, written on November 18, 2020 also documented that petitioner's *new symptoms* of numbness and tingling in her hands and feet, along with difficulty walking, were not

explained by pre-existing lumbar stenosis. Pet'r Ex. 6 at 1. Even though petitioner had a successful hip replacement which alleviated her hip pain and some lower back pain, her numbness and tingling in her extremities remained. Pet'r Br. at 5. It is petitioner's ongoing neurological symptoms of numbness and tingling, along with decreased sensation in her extremities that make it difficult for petitioner to perform basic activities of daily living and enjoy her other interests such as cooking, having her grandchildren over, or even working. *Id.* at 7-8. At the time the briefs were written, petitioner was still taking 300 mg of Gabapentin three times a day to address her neurological symptoms.

Respondent asserted that petitioner's GBS was "mild-to-moderate," and that her illness had "primarily resolved with treatment in April 2020, just over six months after vaccination, allowing petitioner to perform most of her regular daily activities." Resp't Br. at 5. Respondent also argued that petitioner's treatment of her GBS was moderate, "only requiring a three-day hospital stay," and she did not have "multiple rounds of IVIG," or inpatient rehabilitation, as seen in "more severe GBS cases." *Id.* at 6. Finally, respondent argued that petitioner's "reported sequelae of poor balance, pain, and paresthesia were relatively mild, even after a May 2021 total right hip arthroplasty and a one-year gap in treatment before her last documented appointment in June 2023." *Id.*

Petitioner stated that "GBS cases have historically run the spectrum [for awards]," and that the median award for GBS cases from inception through July 31, 2020, has been $165,000.00. Pet'r Reply at 6. Petitioner also disagrees with respondent's characterization that she recovered "shortly after the six-month minimum" is "unjustified and simply wrong." *Id.* Petitioner compared her case to the *Hood* and *Creely* cases. Petitioner asserts that she is similarly situated to the petitioner in *Hood,* who was awarded $200,000.00 in past pain and suffering and $1,000.00 per year in future pain and suffering. Pet'r Br. at 9. The petitioner in *Hood* was hospitalized for six days, admitted to ten days of inpatient rehabilitation, and completed two courses of IVIG and a course of prednisone. *Hood v. Sec'y of Health & Hum. Servs.,* No. 16-1042V, 2021 WL 5755324, at * 8 (Fed. Cl. Spec. Mstr. Oct. 19, 2021). Additionally, the petitioner in *Hood* completed 86 outpatient physical therapy sessions and his residual symptoms included "easy fatiguability in his legs," "numbness and tingling in his feet," and he was "unable to walk or drive long distances." *Id.* Respondent disagrees that *Hood* offers a comparable case and states that the facts are "easily distinguishable" from petitioner's case. Resp't Br. at 8. Respondent notes that the petitioner in *Hood* was a 32-year-old butcher, who had fallen four times prior to his hospitalization resulting in foot and hand fractures, and when he was hospitalized for GBS, had a left sided facial droop and paresthesia in his extremities. *Hood,* at *3-4. In determining the *Hood* petitioner's pain and suffering, the special master reasoned that the GBS resulted in six-years of sequelae, limited his ability to play with his daughter; and prevented him from returning to his job as a butcher at a young age. *Id.* at *4, 8-10.

Petitioner also compared her case to the *Creely* case in which I awarded the petitioner $250,000.00 for five years of past pain and suffering, along with a life-care plan for future medical issues. Pet'r Br. at 9-10. Petitioner argues that the petitioner in *Creely* was an active 75-year-old with pre-existing medical conditions, including left knee degenerative joint disease, right sciatica, fatigue and back pain. *Id.*; *see Creely v. Sec'y of Health & Hum. Servs.,* No. 18-1434, 2022 WL 1863921 (Fed. Cl. Spec. Mstr. Apr. 27, 2022). Petitioner asserted that she was

an active, healthy 64-year-old who had been planning on working well into her future, and the only other issues she had been facing were musculoskeletal, which resolved when she underwent hip surgery in May of 2021. Pet'r Br. at 10. The petitioner in *Creely* was initially hospitalized for seven days, treated with IVIG, then went to acute inpatient care for nineteen days. *Creely,* 2022 WL 1863921, at *12. Additionally, the *Creely* petitioner could no longer sleep in his own bed, but instead had to sleep in a hospital bed in his living room, he could no longer bathe on his own, suffered from multiple falls due to the GBS, and lost the ability to operate his pizza shop. *Id.* at *10-12. Respondent argued that *Creely* is also not a relevantly comparable case to the present case because the hospital courses and treatment were significantly different, involved prolonged use of a wheelchair and walker, and his GBS resulted in limited mobility confining him to a hospital bed and the inability to shower or address personal care needs independently. Resp't Br. at 9.

Respondent compared petitioner's case to *Dillenbeck,* where the 60-year-old petitioner was awarded $170,000.00 for her past pain and suffering from his vaccine-related GBS and $500.00 per year for future pain and suffering. Res't Br. at 6. The treatment for the petitioner in *Dillenbeck* included a two-week hospitalization, IVIG infusions, and outpatient physical therapy. *Dillenbeck v. Sec'y of Health & Hum. Servs.,* No. 17-428V, 2019 WL 4072069, at *2 (Fed. Cl. Spec. Mstr. July 29, 2019), *aff'd in part and remanded,* 147 Fed. Cl. 131 (2020). After the hospitalization, the petitioner required in-home assistance provided by her family for household tasks such as grocery shopping, driving, cooking, and laundry, for six-months and experienced persistent pain and fatigue due to her ongoing symptoms. *Id.* at *3-4. The petitioner's balance issues persisted, along with decreased grip strength and lack of sensation in her hands. *Id.* The petitioner in *Dillenbeck* eventually lost her job because she was unable to return to work full-time and participate in the physical tasks necessary for her veterinarian tech position. *Id.* The Chief Special Master reasoned that the pain and suffering calculation included the petitioner's "distress relating to her inability to continue working as a vet tech" and that her ongoing sequelae interfered with her enjoyment of her life, warranted an award of future pain and suffering. *Id.* at *15. Respondent emphasized that the petitioner in *Dillenbeck* had a longer hospitalization and had courses of IVIG, compared to the petitioner's treatment course in this case, as factors that warranted the higher award.

Referencing the *Weil* case, in which the petitioner was awarded $140,000.00 for pain and suffering, respondent asserts that the petitioner in *Weil,* had a longer recovery period, which included two months of physical therapy and lingering mild numbness in his right foot. Resp't Br. at 7; *see also Weil v. Sec'y of Health & Hum. Servs.,* No. 21-831V, 2023 WL 1778281 (Fed. Cl. Spec. Mstr. Feb. 6, 2023). Respondent also asserted that the petitioner in *Weil* required medication specific to GBS, including gabapentin and baclofen, which was somehow different than what the petitioner in this matter has taken to treat her symptoms. Resp't Br. at 8. However, the petitioner in *Weil,* actually stopped taking such medication less than two months after his hospitalization for GBS. *Weil,* 2023 WL 1778281, at *2.

In her reply brief, petitioner argued that respondent "misstated the facts to try to unfairly portray her case as if she has nearly or completely recovered." Pet'r Reply at 3. Petitioner stated that she continues to take Gabapentin three times a day at 300/mg per dose. *Id.* Additionally, different from the petitioner in *Weil,* she will continue to use this medication "for the foreseeable

future." *Id.* Petitioner also argues that the factors to be considered when evaluating pain and suffering is not the number of doctor's visits or length of hospitalization. *Id.* at 4. Petitioner noted that the median award of pain and suffering in GBS cases is $165,000.00 and "nowhere in the reported cases is there any case that would warrant such an unreasonable award of $90.000." *Id.* at 5. Finally, petitioner argued that her ongoing symptoms of numbness and weakness, which is documented by her neurologist, will not likely resolve and there is no amount of physical therapy that could end these symptoms. *Id.* at 6. She argued that even if petitioner's level of pain and suffering does not warrant the amount in *Creely,* all of the cases referenced by respondent "are not supportive of a $90,000.00 award." *Id.* Petitioner reiterated her request for $200,000.00 in past pain and suffering and an award of $1,000.00 per year for her life expectancy (reduced to present value). *Id.* at 7.

## IV.    Analysis

### a. Actual Pain and Suffering

As noted above, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9. Impairment of function and loss of activities are also considered. Here, petitioner's awareness of her injury is not disputed. Thus, the focus must be on the severity of her injury, its duration, the impairments in function and loss of activities that have been caused by GBS as well as the overall impact of these injuries on her life.

Petitioner received the flu vaccine on October 14, 2019. According to both the medical records and the affidavits, petitioner's GBS symptoms of numbness and tingling in her extremities began approximately two to three weeks post-vaccination and by November 21, 2019, had become severe enough that petitioner went to the emergency department. Pet'r Ex. 4 at 63. Petitioner told the emergency department medical staff that she had tingling and a cold sensation in her feet for approximately one month and that the sensation was worsening to the point of being painful. *Id.* Petitioner was unable to walk without assistance. Her neurological exam revealed that she had reduced sensation to pinprick "in a stocking glove distribution from the feet to the knees and from the fingers to the MCP joints." *Id.* at 109. Her ankle reflexes were also depressed. *Id.* While she was only treated for electrolyte imbalance, which improved her weakness, petitioner's paresthesias continued when she was discharged on November 24, 2019. *Id.* at 146.

The EMG on December 6, 2019 revealed "subacute motor and sensory demyelinating polyneuropathy with secondary axonal features," and her neurologist, Dr. Jenice Robinson wrote, "Given her symptom onset, [it] is most suspicious for a form of Guillain-Barré syndrome." Pet'r Ex. 5 at 6. By the time petitioner saw Dr. Crystal Lantz-DeGeorge on December 17, 2019, petitioner had stopped working and was unable to drive due to the numbness and tingling in her hands and feet, along with weakness in her feet. Pet'r Ex. 12 at 32-33. A neuromuscular ultrasound of petitioner's forearms was "abnormal," and showed "evidence of moderate nerve enlargement at non-entrapment median serve segments and the brachial plexus." Pet'r Ex. 12 at 10. Petitioner received a three-day course of IVIG, a standard treatment for GBS. *See generally* Pet'r Ex. 7. Petitioner had "some improvement" in symptoms

after the IVIG, but was still feeling "significant numbness and 'coldness' in her hands and feet," and petitioner reported that those symptoms were "interfering with day to day life." Pet'r Ex. 12 at 24. She also required "a lot of assistance with walking." *Id.*

Despite respondent's assertion that petitioner's symptoms lasted only six-months, petitioner experienced persistent numbness and tingling in her upper and lower extremities bilaterally for four years post-vaccination and from all indication these symptoms are continuing. In June 2022, approximately two and half years post-vaccination, petitioner's neurologist, Dr. Geiger, referred to petitioner's GBS as "monophasic, with a gradual but incomplete recovery." Pet'r Ex. 14 at 7. Her neuropathic symptoms, including fatigue, gait instability, numbness, and muscle weakness, were continuous since diagnosed with GBS. *Id.* Additionally, these symptoms resulted in difficulty performing fine motor skills with her fingers and hands and she becomes progressively more fatigued, making it more difficult to walk. *Id.* At her follow-up appointment with Dr. Geiger in June 2023, Dr. Geiger and Dr. Patrick Fagan, a neuromuscular fellow, petitioner was still taking 300 mg of gabapentin three times a day for her neuropathic symptoms, and still had diminished sensation to pinprick in both upper and lower extremities bilaterally as well as absent knee and ankle reflexes. Pet'r Ex. 28 at 2. Dr. Fagan wrote, "As the initial injury was over three years ago, any further significant neurological recovery is unlikely." *Id.* at 1.

Respondent argues that petitioner's limited hospitalization and receiving only one course of IVIG is evidence that she had a mild case of GBS, warranting a low award for pain and suffering. Treatment, including length of hospitalization, types of interventions, and rehabilitation treatment can provide insight as to the severity of an injury, however, treatment course alone is insufficient to evaluate the severity of the pain and suffering of a vaccine injury to a petitioner. Additionally, the inability to get an accurate diagnosis and treatment for the diagnosis may affect the severity of the injury and the petitioners' initial pain. Delays in diagnosis and treatment not only prolong initial symptoms causing pain or discomfort but may also make treatment less effective as the disease progresses. That may well have happened in this case.

Initially, when petitioner was hospitalized, the focus of her medical providers was on her other underlying conditions, including epidural lipomatosis, an electrolyte imbalance, and cervical stenosis. *See* Pet'r Ex. 14 at 146. Petitioner did not receive IVIG, the standard treatment for GBS, until after an EMG and neuromuscular ultrasound nearly six-weeks after she was discharged from the hospital. The IVIG provided some relief for her weakness, but her residual symptoms of numbness and tingling, remained and continued for nearly five years post-vaccination. Even with petitioner's limited hospitalization and one three-day course of IVIG, the respondent's proffered amount of $90,000.00 is too low. In the *Walter* case, petitioner also had a delay in diagnosis of GBS and only received one course of IVIG but was awarded $130,000.00 in pain and suffering by Chief Special Master Corcoran. *Walter v. Sec'y of Health & Hum. Servs.,* No. 21-1461V, 2024 WL 1299576 (Fed. Cl. Spec. Mstr. Feb. 27, 2024). Additionally, the amount proffered by respondent fails to acknowledge that "GBS is a particular[ly] frightening injury, given its nature and progression," and as a result "it is common to award actual pain and suffering amounts in such cases in excess of $100,000.00—and typically more." *See Enstrom v. Sec'y of Health & Hum. Servs.,* No. 20-2020V, 2023 WL 345657, at *6 (Fed. Cl. Spec. Mstr.

Jan. 20, 2023). The majority of awards for pain and suffering in reasoned decisions involving GBS were usually not less than $125,000.00. *Id.* at n.14.

Notably, the respondent does not reference cases in which a petitioner was awarded below $100,000.00 in reasoned damages decisions involving GBS. Even the petitioner in the *Weil* case, which respondent cited as justification for a lower award for pain and suffering, was awarded $140,000.00 in pain and suffering, $50,000.00 more than what respondent proffered in this matter. *Weil*, 2023 WL 1778281, at *6. Though respondent asserts that the petitioner in *Weil* had a "more severe treatment course," which warranted a higher award, the residual symptoms and effects of those symptoms on the petitioner in *Weil* as compared to petitioner were milder and unilateral and the petitioner in *Weil* was able to return to work after seven months. *Id,* at *5; *see also* Resp't Br. at 6-7. In this case, petitioner's residual symptoms of numbness and tingling are bilateral and in her upper and lower extremities. Additionally, petitioner in this matter continues to treat her ongoing neuropathic symptoms with 300 mg of gabapentin three times a day nearly five years after her vaccination and had to leave the workforce. *See* Pet'r Ex. 14 at 7; Pet'r Ex. 28 at 1-2.

Measuring the severity of petitioner's injury is not limited to an evaluation of the initial treatment course, but also the impact the injury has had on the petitioner's life. *See Johnson v. Sec'y of Health & Hum. Servs.,* No. 16-1356V, 2018 WL 5024012, at *7 (Fed. Cl. Spec. Mstr. July 20, 2018) (finding that petitioner's lack of taking medications following a diagnosis of GBS "does not change the way her injury affected her life."). In cases involving GBS where petitioners were awarded above $150,000.00 in pain and suffering, such as in *Johnson* and *Dillenbeck,* the special masters considered how the petitioners' GBS affected their ability to drive and return to full employment. In *Johnson,* the had worked as a school bus driver and part-time school librarian. *Johnson,* 2018 WL 5024012, at *2. After her GBS diagnosis, she did not take gabapentin following her injury because she was concerned about adverse effects of medication and was unable to return to her position as a bus driver for nearly eight months and had reduced the number of hours she worked as a librarian due to ongoing residual symptoms of numbness, pain, and fatigue. *Id.* at, *5. The special master reasoned that $180,000.00 for pain and suffering was an appropriate amount because petitioner's residual symptoms caused a dramatic change in her life, including interfering with her ability to work and work the number of hours she had previously worked. *Id.,* at *7. Similarly, in *Dillenbeck,* the petitioner's residual GBS symptoms of decreased sensation in her hands and feet, weakness in her hands, and generalized fatigue, ultimately resulted in her inability to perform the work as a vet tech "from which she clearly took great pleasure." *Dillenbeck,* 2019 WL 4072069, at *14.

Finally, petitioner and her family and friends gave sworn statements which explained how the GBS affected the petitioner and her ability to engage with her family members and in her community. Prior to the GBS, petitioner had worked as a health and safety inspector and had recently started a new job. Petitioner "loved her job" and was planning to work until her seventies. Pet'r Ex. 37 at ¶ 10. She hosted her grandchildren for sleepovers, large gatherings for her friends and family, and enjoyed cooking and needlework. *Id.* at ¶¶ 12-14. Afterwards, she has been unable to cook extensive meals, including Thanksgiving, or host large gatherings such as Fourth of July cook-outs. *See* Pet'r Exs. 30, 33, 34, 36. Petitioner is unable to drive due to her ongoing symptoms of numbness and tingling and relies on others, such as her husband and

friends to take her to appointments or community events. Her fatigue has made it difficult for her to participate in family activities or social engagements, which used to be routine and regular for petitioner. It is clear from the statements of petitioner's friends and family that the GBS has had a dramatic impact on her happiness, her independence, and her overall quality of life.

While it may be tempting to downplay the significance of sensory symptoms such as numbness and loss of feeling in feet and fingers, when those symptoms dramatically change the life of an active person they should not be discounted. When an active person is no longer able to drive in this modern world that is a significant limitation and loss of independence. When she had to give up a responsible executive position as an industrial safety specialist which she loved and which required significant physical mobility that is also a significant loss not only in terms of income but in terms of self esteem and independence. When she is no longer able to do so many of the activities of life that she had enjoyed before, as described above, that is also a significant loss that cannot be measured by the number of IVIG treatments or physical therapy appointments. The petitioner has presented through her medical records and affidavits a credible and consistent account of her loss of mobility, fine motor capabilities and independence.

In addition to the neurological deficits, petitioner suffered from other GBS sequelae, including fatigue and exhaustion, affecting her ability to participate in social activities, work, or family activities. These residual effects of her GBS were well documented by the statements of petitioner and her friends and family. One such example is when petitioner attended the theater with friends, she had to be driven by a friend, it took additional time to walk from the car to the theater and petitioner had to sit separated from her group of friends in handicap seating during the play and she was exhausted after it. Pet'r ex. 35 at 2.

Even though petitioner's treatment was not as extensive as in other GBS cases, likely complicated by the COVID-19 pandemic beginning nearly six-weeks after she received IVIG and she was unable to participate in physical therapy due to her underlying hip osteoarthritis, her residual sensory symptoms and fatigue have had a significant impact on her life, including her ability to work, and be as active as she once had been with her family and community. In this respect, petitioner's residual course is similar to that of the petitioners in *T.M.* and *Dillenbeck*, where ongoing residual sensory symptoms and fatigue had a significant impact on their ability to enjoy life through family and social engagements. *See T.M. v. Sec'y of Health & Hum. Servs.*, No. 19-119V, 2023 WL 355358 (Fed. Cl. Spec. Mstr. Jan. 23, 2023); *Dillenbeck,* 2019 WL 4072069, at *3, *14-15.

Based on a review of the entire record and consideration of the facts and circumstances presented here, I find that an amount of $200,000.00 represents a fair and appropriate amount of compensation for petitioner's actual past pain and suffering and emotional distress.

### b. Future Pain and Suffering

I also find that an award for future pain and suffering is reasonable and appropriate given the ongoing residual symptoms caused by GBS and the virtual certainty that these symptoms and functional limitations are at this point permanent as attested by her neurologists.

At her last neurology appointment on June 26, 2023 with Dr. Geiger and Dr. Patrick Fagan, petitioner continued to report "numbness, neuropathic pain, weakness and gait instability." Pet'r Ex. 28 at 1. Dr. Fagan described these symptoms as "long-term sequela of the AIDP," and he noted, "As the initial injury was over three years ago, any further significant neurological recovery is unlikely." *Id.* Petitioner was instructed to continue using gabapentin and follow-up as needed or if her symptoms got worse. *Id.* The symptoms of bilateral numbness and decreased sensation in her arms and legs, along with absent reflexes in her knees and ankles, have been consistently reported by petitioner since her initial injury. I agree with Dr. Fagan that further recovery is unlikely and that her injuries and functional limitations are permanent.

In addition to the neurological deficits, petitioner suffered from other GBS sequelae, including fatigue and exhaustion, affecting her ability to participate in social activities, work, or family activities. These residual effects of her GBS were well documented by the statements of petitioner and her friends and family. One such example is when petitioner attends the theater with friends, she must be driven by a friend, it takes additional time to walk from the car to the theater and petitioner must sit separated from her group of friends in handicap seating during the play. Pet'r Ex. 35 at 2.

In this respect, petitioner's residual course is like the petitioners in *T.M.* and *Dillenbeck*, where ongoing residual sensory symptoms and fatigue had a significant impact on their ability to enjoy life through family and social engagements. *See T.M. v. Sec'y of Health & Hum. Servs.,* No. 19-119V, 2023 WL 355358 (Fed. Cl. Spec. Mstr. Jan. 23, 2023); *Dillenbeck,* 2019 WL 4072069, at \*3, \*14-15. Accordingly, I find that an award of $1,000.00 per year for her life expectancy, reduced to net present value, is a more appropriate amount than the $500.00 awarded for future pain and suffering in *T.M.* and *Dillenbeck*. The petitioners in those cases were able to return to their jobs and were able to drive again, while in this case, petitioner was forced into an early retirement which clearly impacted her sense of purpose and self-worth and with the inability to drive, she lost autonomy and has become reliant on others, making it difficult to stay connected to her family and friends.

Petitioner has residual effects of GBS that warrant an award of future pain and suffering, and thus, the undersigned awards $1,000.00 per year for her life expectancy. The petitioner was born on July 5, 1955 and is currently 69 years old. Based on the Social Security Administration's life expectancy table for a woman, aged 69 and 4 months is 18.2 years. Current rates for U.S. Treasury bonds for two-, five- and ten-year maturities range from 4.13 to 4.25. If the respondent elects to pay future damages in a lump sum, the parties are encouraged to come to agreement on life expectancy and a rate for reduction to present value that may be guided by these figures. If the future award is paid through an annuity purchased by the respondent, reduction to present value is not necessary.

**V.      Conclusion**

In accordance with the above, and in consideration of the record as a whole, the undersigned finds that petitioner should be awarded: (1) $200,000.00 for actual (or past) pain and suffering; (2) $1,000.00 per year reduced to net present value, for petitioner's life expectancy for future pain and suffering; (3) $92,241.00 for lost wages; (4) $3,468.00 for past unreimbursed

expenses; and (5) $1,074.00 for future medical expenses—the latter three sums having been agreed upon by the parties.

The parties are to file a joint status report within thirty days, by December 16, 2024, (1) converting the undersigned's award of future pain and suffering to its net present value, and (2) providing a statement confirming that this ruling reflects all items of damages and that no issues remain outstanding.  If the parties are unable to agree on the amount of the net present value of the future award, I will be guided by the above figures in establishing an award.

Thereafter, a damages decision will be issued.

**IT IS SO ORDERED.**

<u>**s/Thomas L. Gowen**</u>
Thomas L. Gowen
Special Master